AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

Northern District of California

FILED

SEP – 4 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Terence Tirona, | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Case No.

**3  19  71454**

UNDER SEAL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____November 29, 2017_____ in the county of _____San Francisco_____ in the

_____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____
WILLIAM FRENTZEN
Assistant United States Attorney

Sworn to before me and signed in my presence.

_____
*Complainant's signature*

Janette Spring, Special Agent - FBI
*Printed name and title*

_____
*Judge's signature*

Date:  __9/3/19__

City and state:  _____San Francisco, California_____

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

### A.   SYNOPSIS

1.    I submit this affidavit in support of a criminal Complaint for Terence TIRONA ("TIRONA"), Salvador DEL ROSARIO ("DEL ROSARIO") and Catherine CARIAGA PALMA ("CARIAGA").

2.    There is probable cause to believe TIRONA, DEL ROSARIO, CARIAGA engaged in a scheme to commit Medicare fraud by receiving cash kickback payments in exchange for the referral of home healthcare patients in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3.    As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4.    An identified co-conspirator introduced TIRONA as an individual who was willing to accept kickback payments in exchange for the referral of patients. TIRONA later introduced DEL ROSARIO and CARIAGA to UCE in furtherance of the scheme.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

5.     During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with TIRONA, DEL ROSARIO, and CARIAGA, in 2017 and 2018, in which TIRONA, DEL ROSARIO, and CARIAGA, received kickback payments in the form of cash in exchange for the referral of home health and/or hospice patients.

## B.   BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6.     Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.
[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

7.     An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments.

8.     Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9.     In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the

3

initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed

10.     In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.

    [5]  During the course of the UCO, there was one complaint regarding patient care provided by HHA

_____

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C.  AGENT QUALIFICATIONS

11.    I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12.    In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read iterviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13.    This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are

presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D.  COMPLAINANTS

14.     Terence TIRONA is a 33 year old case manager at Regional Medical Center ("RMC") at 225 N Jackson Ave, San Jose, CA 95116. TIRONA was introduced to CW-1 and UCE by co-conspirator Hilda TACORDA ("TACORDA"). During the course of the investigation, TIRONA accepted $3,000 in kickbacks from an FBI UCE in exchange for patient referrals.

15.     Sal DEL ROSARIO is a 44 year old case manager at Regional Medical Center at 225 N Jackson Ave, San Jose, CA 95116. DEL ROSARIO was introduced to UCE by TIRONA.

16.     Catherine CARIAGA is a 31 year old a case manager and a nursing assistant at Lucile Packard Children's Hospital based in the Bay Area. CARIAGA was introduced to UCE by TIRONA.

### E.  STATUTE VIOLATED

17.     **Title 42, United States Code, Section 1320a-7b(b)(1)(A),** in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A.  TIRONA IS INTRODUCED TO UCE BY A CO-CONSPIRATOR

18.     In January 2017, CW-1 identified GLENNDA SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

19.     CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

20.    During the course of the UCO, SANTOS introduced multiple individuals, including physicians and case managers, willing to accept kickback payments in exchange for the referral of home health and hospice patients. TIRONA, DEL ROSARIO, and CARIAGA were introduced to UCE by a co-conspirator, TACORDA, a home health marketer employed by Amity Home Health Care, Inc. ("AMITY"). TACORDA was introduced into the scheme by SANTOS.

21.    As set forth above, SANTOS introduced TACORDA to CW-1 and UCE on or about August 30, 2017 by providing CW-1 and UCE with TACORDA's contact information. Later, TACORDA and CW-1 exchanged text messages, in which they discuss patient referrals and arranged a meeting with TIRONA. Excerpts of their text message exchange occurring between approximately November 28 and 29, 2017 and are detailed below:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| TACORDA: | Have a hospice for you | TACORDA informs the CW-1 that an incoming hospice patient referral ["Patient 1"][6] will be sent to him/her in connection with the kickback scheme. |
| CW-1: | Sweet | |
| .... | | |
| CW-1: | Also ask Terence if he is ok to meet Thursday with you as well. What do you think? | The CW-1 inquires whether TIRONA (i.e. "Terence") is available to meet regarding the kickback scheme. |
| CW-1: | So we can give you the referral thank you too. | The CW-1 explains he/she wants to pay TACORDA (i.e. "thank") a kickback for the introduction to TIRONA. |
| TACORDA: | Will ask him | |
| CW-1: | My bad I meant this Thursday also if Terence is ok to meet we can thank him and give him his envelope too | Again, the CW-1 refers to paying cash (i.e. "envelope") kickbacks (i.e. "thank you") to TACORDA and TIRONA. |
| TACORDA : | K will let you know about T [TIRONA} | TACORDA responds that she will deliver the CW-1's message and request to meet to TIRONA. |

---

[6] Throughout this affidavit, I have removed patients' names to protect their privacy, and have referred to them instead as "Patient 1," "Patient 2," etc.

19. On or about November 29, 2017, CW-1 and TIRONA exchanged text messages, in which TIRONA confirmed he had spoken with TACORDA about meeting. An excerpt of their text message exchange is outlined below:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| CW-1: | Also did you talk to Hilda [TACORDA]. If you have time this Thursday let's meet up for a quick chat around lunch time. We can meet in the parking area if that works or Starbucks nearby RMC | The CW-1 asked if TIRONA spoke with TACORDA about meeting to discuss the kickback scheme. |
| TIRONA: | She did talk to me. That would normally work, but I'm off on Thursday, come back Friday | TIRONA confirms that he has spoken with TACORDA about the kickback scheme and they discusses availability to meet. |

## B. TIRONA ACCEPTS KICKBACKS FROM UCE IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS

20. On or about November 30, 2017, CW-1 and UCE recorded a meeting with TIRONA in a parking lot near a Starbucks in Hayward, CA. During their meeting, TIRONA confirmed he discussed the kickback scheme with TACORDA prior to their meeting. TIRONA stated his preference to be paid on a per patient basis and offered examples of amounts as paid by other home health and hospice agencies. Below are excerpts of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| CW-1: | If I am not there, he can get things going. | The CW-1 refers to his/her collaboration with UCE regarding the kickback scheme. |
| CW-1: | Did Hilda talk to you? Amity is crazy, we don't want to compete with them. | The CW-1 refers to AMITY and their brazenness in engaging kickback schemes. |
| TIRONA: | Ya, yay a, they are too much too. A little too aggressive. | TIRONA agrees with the CW-1. |
| ... | | |
| CW-1: | Where do you feel comfortable? Let's say we do two? So we don't disrespect you. To keep the relationship so that ... | The CW-1 inquires whether $2,000 per month for TIRONA's participation in the kickback scheme is a sufficient payment (i.e. "do two"). |
| TIRONA: | So it think, it'd be easier so I don't feel pressured. | |

| UCE: | Want to just do it per person? | UCE offers to pay TIRONA a kickback on a per patient basis rather than a flat monthly rate (i.e. "per person") |
|---|---|---|
| TIRONA: | Perfect, so much easier. So there is no pressure on any side. | TIRONA responds that he prefers to be paid a kickback per patient instead of a flat fee. |
| UCE: | Perfect, easy. | |
| CW-1: | Do you do a different number for home health or hospice? It's a two way street. | The CW-1 asks TIRONA what kickback amount he [TIRONA] is expecting in exchange for a particular type of patient. |
| TIRONA: | I'll just say this, and flat out, I'll be honest with you guys, other places they are doing four for Medicare home health and five for hospice. I'm comfortable with that, I wouldn't want to push any higher. | TIRONA explains to UCE and CW-1 how much other entities in the industry are paying as part of their kickback schemes. TIRONA states that others pay kickbacks of at least $400 (i.e. "four") per Medicare patient referral and $500 (i.e. "five") per hospice patient referrals. This statement shows TIRONA is already familiar the operation and going rates of similar kickback schemes. |
| ... | | |
| UCE: | ...I have something for you that's basically exactly in line with that, it's five, and then, and then yeah if, is that ok? | UCE lets TIRONA know that he is prepared to pay TIRONA $500 for the referral of a Patient 1. |
| TIRONA: | Yeah, no, absolutely. | |
| ... | | |
| UCE: | So basically, he'll [CW-1] put you on a group text with me, go ahead and let him know, and I'll arrange a time and I'll come down and see you and we'll take care of it. One by one, easy. | |

21.   At one point during the same meeting, UCE offered to move their discussion to CW-1's car, to which TIRONA agreed. TIRONA likely preferred they speak in the car to avoid being overheard discussing their illicit kickback arrangement or risk being observed receiving a kickback payment. While in the car, UCE paid TIRONA $500 cash for the referral of Patient 1. Below are the transcribed excerpts of their exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Would you like to go to your car? | UCE asks whether they want to move their conversation to the CW-1's car. |

| TIRONA: | Ya, I'd rather do that. | TIRONA confirms that he would rather speak about the kickback scheme inside a vehicle. |
| ... | | |
| UCE: | This should be five hundred. We want to be low stress. Any questions or concerns? | UCE refers to the amount of the kickback as $500. |
| TIRONA: | Thank you. Great. That is perfect. I don't want it to be where you give per month and there is too much stress with that. | |
| UCE: | No specific numbers, keep it at the pace you want. Anyone give you heat, we will shake our hands and say good. | UCE reminds TIRONA that his participation in the kickback scheme is voluntary. |

22.     During the course of the UCO, UCE recorded multiple in-person meetings with TIRONA. TIRONA met with UCE on at least five occasions and received a total of $3,000 in kickback payments from UCE. In exchange for kickback payments, TIRONA referred three Medicare beneficiaries to HHA Alpha and introduced UCE to other case managers willing to engage in the scheme.

### C.  TIRONA INTRODUCES UCE TO A CO-CONSPIRATOR

23.     On or about February 1, 2018, CW-1 and UCE exchanged text messages with TIRONA in which they discussed an introduction to another case manager, DEL ROSARIO. TIRONA offered to make the introduction as TIRONA believed DEL ROSARIO would be willing to participate in the kickback scheme. Below are excerpts of their text exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| TIRONA: | Okay, almost done with meeting | |
| TIRONA: | I'll come down with Sal | TIRONA refers to his case manager connection (i.e. "Sal"). The case manager is later identified as SAL DEL ROSARIO. |
| TIRONA: | Sal is scared, he is asking to meet in the parking lot at Mendozas. It's across the street | TIRONA explains DEL ROSARIO is nervous to meet them, presumably because DEL ROSARIO and TIRONA know the kickback scheme is illegal (i.e. "Sal is scared"). TIRONA explains DEL ROSARIO wants to meet in a parking lot, which UCE understands is likely a precautionary measure to minimize detection by law enforcement or others. |
| UCE: | Sure. | |

24.    On the same date, CW-1 and UCE recorded a meeting with TIRONA. They discussed the

referral of other individuals willing to participate in the kickback scheme. Once again, TIRONA

identified DEL ROSARIO as an interested participant, as detailed in the excerpts below:

| Speake | Statement | Additional Explanation |
|---|---|---|
| CW-1: | He knows you're on board with us, right? | The CW-1 asks TIRONA whether DEL ROSARIO is already aware of the kickback scheme and TIRONA 's participation  (i.e. "on board "). |
| TIRONA: | Yes, he does, I'm the one who told him. | TIRONA confirms that he has briefed DEL ROSARIO (i.e. "I'm the one who told him") on the kickback scheme and DEL ROSARIO wants to participate in it. |
| TIRONA: | So the way to keep it safe with him, cause when he works with other companies, and I know that, is that he sends it to a SNF, then the SNF sends it back. This way you guys keep it on the low and nobody knows. I told him not to do that. And he said he's fine with that. So if that's ok with you guys? | TIRONA explains that DEL ROSARIO already participates ("he works with other companies") in other kickback schemes involving skilled nursing facilities (i.e. "SNF") and/or HHAs. TIRONA further explains how he advised DEL ROSARIO to alter his practices to minimize detection by authorities (i.e. "keep it on the low"). |
| CW-1: | Yeah. | |
| .... | | |
| UCE: | Yea, it has to be totally trustworthy, I'm happy to talk to him about it, but if it's not like totally totally, like you trust him and that's the only way we expand the circle. With people that we totally trust. | UCE expresses to TIRONA that he/she relies on TIRONA to vet individuals willing to participate and grow the kickback scheme (i.e. "expand the circle"). |
| TIRONA: | No I trust him. | TIRONA affirms DEL ROSARIO can be trusted to engage in illegal conduct with them. |

30.    After confirming DEL ROSARIO could be trusted to engage in the scheme, TIRONA left

the meeting to find DEL ROSARIO and bring him to meet CW-1 and UCE. Soon thereafter, TIRONA

returned with DEL ROSARIO and the meeting resumed. UCE confirmed the details of the kickback

scheme to DEL ROSARIO and DEL ROSARIO agreed to refer patients to HHA Alpha in exchange for

kickbacks. Transcribed excerpts of their exchange are detailed below:

11

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So the jist of it is we do $500 a patient. Of course we prefer Medicare, but he has the whole list. We don't, again, unlike some of the people, our competition, we don't want exclusive relationships, we're never gonna call and demand like you have to give us a certain quota. We understand that Medicare and hospice pay best, but you have to mix up patients referrals as part of what you're giving out so it looks good. | UCE explains that DEL ROSARIO will receive $500 per patient as part of the proposed kickback scheme. He/She further explains that they prefer to receive Medicare patient referrals as part of the kickback scheme. UCE explains which types of referrals garner the most reimbursements for HHA services (i.e. "Medicare and hospice pay best"), but discusses how DEL ROSARIO may need to send a variety of patient referral types to avoid the appearance of an exclusive relationship (i.e. "so it looks good"). UCE also comments on how other HHAs (i.e. "our competition") may demand a higher volume of patient referrals in connection with other kickback schemes. |
| DEL ROSARIO: | Yes sir, that's right. | |
| UCE: | and if you have any doubts or concerns about the way it looks, umm, we are all about doing it right. And so uhhh if you'd rather see it done a different way, talk to us. We're perfectly good. And if at any point you say, I'm not liking this, or the risk, or whatever it is, | |
| DEL ROSARIO: | Mmm | |
| UCE: | And I'm perfectly happy to be here cause I I I totally get it, but if at any point you decide that this risk isn't worth it, or whatever cause you know, there is a risk | UCE refers to the illegal nature of the kickback scheme (i.e. "there is a risk"). And, UCE refers to the potential consequences of being caught by authorities (i.e. "this risk isn't worth it"). |
| DEL ROSARIO: | Yeah. | |
| UCE: | We try to be as careful as possible, but ya know, let us know, if its not for you well shake your hand and say thanks. We will never be the ones calling you saying hey you haven't sent anything in a while | |
| DEL ROSARIO: | Yeah yeah yeah. | |
| UCE: | It's totally up to you. So any anything ... | |
| DEL ROSARIO: | No, so who do we notify like if we sent something? | DEL ROSARIO asks about how to get his patient referrals started (i.e. "who do we notify"). |

| | | |
|---|---|---|
| CW-1: | You text me, and [ui] and we will, what I'll do, I'll make a group text between all three of us, and then well uhh any patients that you have, text me and well, I'll contact you and hey everything is good, admitted, good to go. | CW-1 explains that he/she will set up a text group, including DEL ROSARIO, the CW-1 and UCE, for them to communicate to coordinate patient referrals and the payment of kickbacks. |
| DEL ROSARIO: | Ahh. Ok ok. | |
| UCE: | And uhhh we'll setup something like this, we'll come down to mendozas and we'll meet you and uhh quick and easy. | |
| DEL ROSARIO: | Yea. | DEL ROSARIO affirms that he is on board with the kickback scheme and communication plan. |

### D. DEL ROSARIO ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS

30.   On February 22, 2018, UCE recorded a second meeting with DEL ROSARIO, in which

UCE paid DEL ROSARIO $1,000 cash for two Medicare patients DEL ROSARIO had referred to

HHA Alpha. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional  Explanation |
|---|---|---|
| UCE: | Alright, alright perfect. So it was two [patients] right? | |
| DEL ROSARIO: | Yeah. | |
| UCE: | Ok, so this should uh be a thousand dollars. | |

31.   DEL ROSARIO met again with UCE on May 17, 2018 to discuss the status of UCE's

takeover of a different HHA. During this meeting, UCE paid DEL ROSARIO $500 cash in anticipation

of additional patient referrals being sent to UCE's new company. Below are excerpts of the

aforementioned exchange:

| Speaker | Statement | Additional  Explanation |
|---|---|---|
| UCE: | Umm and until we actually, we made alternate plans but until we take over the company in October we can't take patients. | UCE explains that he/she is changing their business plan and will no longer pay kickbacks to HHA Alpha. |
| DEL ROSARIO: | No, I got it, I got it. Okay. | |
| UCE: | So urn so but we don't wanna lose anyone's relationship and we also don't want anyone to think that we flaked out or we're not doing it. | UCE explains that he/she wants to continue the kickback conspiracy with DEL ROSARIO and others (i.e. not "lose anyone's relationship") and that UCE plans to continue the scheme (i.e. not "flake out") |

| | | |
|---|---|---|
| DEL ROSARIO: | Yeah. Mmm. | |
| UCE: | So what we, what we're asking is that I have ah five hundred for you. | UCE explains that he/she will pay DEL ROSARIO $500 to continue their relationship and the kickback scheme in the future. |
| UCE: | If you could just stay with us, it's kind of a retention bonus. | |
| DEL ROSARIO: | Yeah, yeah. That's alright. | DEL ROSARIO affirms he understands that acceptance of the $500 confirms he will continue to participate in the kickback scheme at a later date. |
| UCE: | And then in October, five hundred just for starting back up for sending us more patients. | UCE explain that he/she will reach back out again in October about future referral from DEL ROSARIO. |
| DEL ROSARIO: | Okay. That's fine. | |
| UCE: | So that's cool with you? | |
| DEL ROSARIO: | No, that's good, that's good. Yeah. | DEL ROSARIO affirms that he agrees with UCE's proposal to continue the kickback scheme. |

### E.   TIRONA INTRODUCES UCE TO ANOTHER CO-CONSPIRATOR

32.    On or about February 28, 2018, TIRONA sent a text message to CW-1 and UCE

identifying a new participant for the kickback scheme, CARIAGA. Excerpts of this exchange are

detailed below:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| TIRONA: | -Hey, Catherine the case manager is okay. -Do you guys want to meet her? -She's per diem and works 2 weeks on then 2 weeks off. -1st day back today. | TIRONA explains that he explained the kickback scheme already to CARIAGA (i.e. the "case manager ") and CARIAGA wants to participate (i.e. "is okay"). |
| CW-1: | Sure let me see what schedule looks like and will confirm. | |

33.    On or about March 8, 2018, TIRONA sent a message to CW-1 and UCE asking if they

wanted to meet CARIAGA and indicated CARIAGA had a patient referral she could provide to HHA

Alpha. Detailed below is an excerpt from this exchange:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| TIRONA: | Hey I'm back from Vegas. Cat is here today. Can you guys meet her? She has one for you guys | TIRONA explains that CARIAGA (i.e. "Cat") has a patient referral to provide as part of the kickback scheme (i.e. "has one for you guys"). |

34.     On or about March 12, 2018, UCE recorded a meeting with TIRONA during which TIRONA introduced UCE to CARIAGA. During their conversation, CARIAGA confirmed she had already spoken to TIRONA about the kickback scheme prior to their meeting. Below are transcribed excerpts of their conversation:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| TIRONA: | So, this is Cat. She works with us. She's a PRN. | TIRONA introduces CARIAGA to UCE and refers to CARIAGA's work schedule (i.e. as a part-time nurse). |
| UCE: | Excellent. | |
| ..... | | |
| UCE: | Nice, nice. Okay, good. Good. Um, Yeah, so did he, basically get the chance to explain to you? | UCE asks CARIAGA whether TIRONA has already explained the kickback scheme to her. |
| CARIAGA: | Yeah. | CARIAGA confirms she is already familiar with the kickback scheme. |
| UCE: | Okay. | |
| TIRONA: | A little bit, yeah. | |
| ... | | |
| UCE: | So, yeah, Medicare, MediCal are better, but you know, he's got a list of patients. | UCE explains that he/she prefers to receive Medicare patient referrals. |
| CARIAGA: | Okay. | |
| UCE: | List of other insurance- | |
| CARIAGA: | Okay. | |
| UCE: | We're willing to mix in other stuff- | UCE explains that patient referrals as part of the kickback scheme may be mixed with non-Medicare beneficiary referrals. |
| CARIAGA : | Mhm. | |
| UCE: | Cause, you know, it looks bad if everything is (UI) one. | UCE explains that sending only Medicare patients would look suspicious (i.e. "looks bad"). |
| CARIAGA: | Yeah, yeah. Mhm. | CARIAGA affirms her understanding. |

**F. CARIAGA ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS**

35.    During their initial meeting on March 12, 2018, UCE discussed with CARIAGA the risks associated with their arrangement and stressed that her involvement was voluntary. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| UCE: | …you know, you can get trouble with this, so, if there's anything that you think you're taking a risk on, and you don't want to, don't do it for us. | |
| CARIAGA | Mmhmm. | |
| UCE: | We're totally cool with it, just say it. | |
| CARIAGA: | Okay. | |
| UCE: | And anytime you decide you changed your mind, that's easy. | |
| CARIAGA: | Yeah, yeah, yeah. | |

36.    Later during the meeting, CARIAGA and UCE exchanged phone numbers and set up a group text with CW-1 to discuss the kickback scheme, including patient referrals and payments for those referrals.

37.    At the conclusion of the meeting, CARIAGA accepted $500 in cash from UCE for the referral of one Medicare patient to HHA Alpha. This patient referral was referenced by TIRONA during the text exchange with the CW-1 on March 8, 2018. UCE also paid TIRONA $500 cash for introducing CARIAGA into the scheme. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| UCE: | Alright, cool. Anyway, um, so this is, uh, five hundred. | UCE pays CARIAGA $500 cash for the referral of the Medicare patient. |
| CARIAGA | Okay. Thank you. | |
| UCE: | Thank you. And sir, of course, also, for your good work. | UCE pays TIRONA for introducing CARIAGA. |
| CARIAGA: | Thank you, thank you so much. | |

38.    UCE met with CARIAGA on or about June 26, 2018 to discuss the status of the kickback scheme. TIRONA was also present for the meeting, but had already discussed the revised plan with UCE on May 17, 2017. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | . . .we're just kinda saying uh, meeting with one time, explaining them and then um, so I have an envelope for five hundred dollars, if you can just hold on till October, .. . | UCE explains to TIRONA and CARIAGA that he/she will resume requesting additional patient referrals as part of the kickback scheme starting in October. And, UCE offers $500 to each of them in connection with their on-going participation in the kickback scheme. |
| CARIAGA: | Okay. | |
| UCE: | ...and when October comes, if you're happy to send us patients again. | |
| CARIAGA: | Okay. | |
| UCE: | So if that's okay with you? | |
| CARIAGA: | Yeah. | CARIAGA affirms. And, CARIAGA accepts $500 from UCE. |

## III.    PROBABLE CAUSE FOR THE VIOLATION

### A.    TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

39.    Title 42, United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

40.    Based on all of the foregoing, probable cause exists to believe that TIRONA, DEL ROSARIO, and CARIAGA accepted kickback payments from UCE that were intended to induce TIRONA, DEL ROSARIO, and CARIAGA to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

41.    Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by physicians for home health and/or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

42.    Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by TIRONA, DEL ROSARIO, and CARIAGA in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV.    CONCLUSION

43.    Based on the foregoing, there is probable cause to believe TIRONA, DEL ROSARIO, and CARIAGA engaged in a scheme to receive the payment of kickbacks in exchange for patient referrals in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## V.    REQUEST FOR SEALING

44.    Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this _____ day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge